**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK**

───────────────────────────────

**UNITED STATES OF AMERICA,**

       **Plaintiff,**        **05-CR-228A(Sr)**

**v.**

**SHAWANA FISH,**

       **Defendant.**

───────────────────────────────

## REPORT, RECOMMENDATION AND ORDER

   This case was referred to the undersigned by the Hon. Richard J. Arcara, in accordance with 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon dispositive motions.  Dkt. #6.

## PRELIMINARY STATEMENT

   The defendant, Shawna Fish, is charged in a one-count indictment with unlawfully, willfully and knowingly making false material declarations to the grand jury about her knowledge that one of the targets of a grand jury investigation had corruptly influenced, or attempted to corruptly influence, the testimony of another witness before the grand jury, in violation of 18 U.S.C. § 1623.  Dkt. #1.

   The defendant has filed a motion seeking, *inter alia*, dismissal of the indictment on the grounds that: (1) literally truthful answers to ambiguous questions

posed by the government require dismissal; (2) the recantation defense set forth in 18 U.S.C. § 1623(d) affords a complete defense; (3) the government set a perjury trap for the defendant; (4) government misconduct warrants dismissal in the interests of justice; (5) the government deprived the defendant of her right to meaningful assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution; and (6) the defendant was deprived of her right to due process as guaranteed by the Fifth Amendment to the United States Constitution.  Dkt. ##10 & 11.  Alternatively, defendant seeks suppression of defendant's May 3, 2005 grand jury testimony.  Dkt. ##10 & 11. For the following reasons, it is recommended that defendant's motion to dismiss the indictment be **DENIED**, and that defendant's motion to suppress her May 3, 2005 grand jury testimony be **GRANTED.**

## FACTS

The May 2004 Grand Jury for the Western District of New York was investigating whether David Cain, Jr. was using extortion and committing violence to property as part of a plan to eliminate competition from several tree service businesses in Niagara County and Orleans County.  Dkt. #1.  During the course of this investigation, numerous individuals were subpoenaed to appear before the grand jury and were questioned about their knowledge of and/or participation in the alleged extortion.  Dkt. #1.  The grand jury was also investigating whether targets of its inquest, including David Cain, Jr., had corruptly influenced, or attempted to corruptly influence, the testimony of any witnesses who had or would testify before the grand jury.  Dkt. #1.

The prosecutor, Assistant United States Attorney Anthony Bruce, avers that the defendant was subpoenaed to testify before the grand jury because the grand jury had already heard evidence establishing that David Cain, Jr. had engaged in witness tampering and the government was suspicious that David Cain, Jr. had tampered with the defendant's boyfriend, Larry Kropp, based upon its knowledge of a visit by Larry Kropp and the defendant with David Cain, Jr. at the Niagara County Jail on December 7, 2004, immediately prior to Larry Kropp's scheduled appearance before the grand jury.  Dkt. #12, ¶ ¶ 2-3.  Larry Kropp did not actually testify before the grand jury on December 7, 2004, but did testify on January 4, 2005.  Dkt. #14, ¶ 2.  During that appearance, Larry Kropp reportedly answered "no," when asked, "prior to coming here today, did you talk to Dave Cain about coming here today?"  Dkt. #14, ¶ 2.

The defendant testified before the grand jury on February 1, 2005.  Dkt. #10, Exh. C.  Prior to her testimony, she was advised that she was not a target or a subject of the grand jury's investigation and warned that because she was under oath to tell the truth, she could be prosecuted for perjury if she made an intentionally false statement.  Dkt. #10, Exh. C, p.2.  The defendant testified that she drove Larry Kropp to the Niagara County Jail to visit with David Cain, Jr. immediately prior to Mr. Kropp's scheduled appearance before the grand jury on December 7, 2004.  Dkt. #10, Exh. C, pp.3-4.  The defendant, Larry Kropp and David Cain, Jr. visited together for approximately one hour before the defendant drove Larry Kropp to the courthouse.  Dkt. #10, Exh. C, p.4.  The exchange between the government and the defendant concerning this visit is as follows:

Q:      Now, let's go back.  When you went to the Niagara
        County Jail that day, again, you were with Larry Crop
        [sic]?

A:      Yes.

Q:      And there was some discussion for an hour or so with
        David Cain?

A:      Yes.

Q:      And in the course of that discussion did Larry Crop
        [sic] advise David Cain that he was subpoenaed to
        testify before the Grand Jury today - - I'm sorry, on
        that day?

A:      No.

Q:      Not at all?

A:      No.

Q:      Did the subject even come up?

A:      No.

Q:      Were you privy to any discussions between Cain, junior [sic] and
        Larry Crop [sic] where they discussed what Larry Crop [sic] was
        going to tell the Grand Jury when he appeared before the Grand
        Jury?

A:      No.

Q:      Not at all?

A:      I don't understand what you're asking me.

Q:      All right.  Let me go back.  Were you there in that jail
        with Crop [sic] and Cain, junior [sic] when the subject
        came up of what Crop [sic] was going to tell the
        Grand Jury?

A:      It never came up.

Q:      It never came up?

-4-

A:   No, not at the visit, it did not come up.

Q:   All right.

A:   To my knowledge I was sitting right there.

Q:   You heard - - at least you think you heard every word that was passed back and forth between the two of them?

A:   Yes.

Q:   Certainly you were sitting close enough to hear every word that was passed back and forth?

A:   Yes.

Q:   You're telling the Jury the subject of what Larry Crop [sic] was going to tell the Grand Jury never came up?

A:   Not on that day.

Q:   And we'll get to that in a minute.  And the subject of him even appearing before the Grand Jury never came up?

A:   No.

Dkt. #10, Exh. C, pp.5-6.


The prosecutor affirms that during the defendant's testimony, he

instantly suspected and believed that the defendant was lying.  Therefore, I questioned the defendant under the belief that she was perjuring herself, with a view toward making a record that could support a perjury indictment of her . . .

Dkt. #12, ¶ 3.  He also affirms that

the defendant was brought before the grand jury on February 1, 2005, with the intention of using her expected testimony to establish that during the December 7, 2004

> meeting . . . David Cain, Jr. tampered with Larry Kropp. Thus, the defendant's perjurious testimony during that appearance obviously "substantially effected [sic] the proceeding," or, put another way, essentially derailed the grand jury's investigation of this particular criminal conduct by David Cain, Jr.

Dkt. #12, ¶ 5.


Following her grand jury appearance, David Cain, Jr. telephoned the defendant from the Niagara County Jail, which recorded the conversation, and asked her "[w]hat kinda dumb questions were they askin' yas?"  Dkt. #14, ¶ 3.  On April 23, 2005, Niagara County Sheriff's Department Investigator Patrick Weidel and Bureau of Alcohol, Tobacco, Firearms and Explosives' Special Agent Jason Bernhard interviewed Larry Kropp regarding his grand jury testimony.  Dkt. #14, ¶ 4.  Investigator Weidel affirms that Larry Kropp admitted that "he had lied to the grand jury when he told the grand jury that he had not talked to David Cain, Jr. about his (Kropp's) appearance before the grand jury."  Dkt. #14, ¶ 5.  Investigator Weidel affirms that he and Special Agent Bernhard interviewed the defendant on April 25, 2001, and that she admitted that her testimony before the grand jury had not been completely truthful.  Dkt. #14, ¶ 7. The prosecutor states,

> Upon information and belief, the defendant did not ask to speak to either Weidel and/or Bernhard on April 25, 20[0]5, but rather came to Weidel's office at Wieidel's request, and in her discussions with Weidel and Bernhard of that day, did not repudiate her February 1, 2005 testimony or request that the agents arrange for her to return to the grand jury to correct it, but rather admitted to having lied during her February 1, 2005 appearance only in response to questions from Weidel and Bernhard.

Dkt. #12, ¶ 8.

The defendant was recalled to testify before the grand jury on May 3, 2005.  Dkt. #12, ¶ 7.  The prosecutor affirms that before the defendant entered the grand jury room, he

> interrogated her (in the presence of several agents).  In that interrogation, I told the defendant that I knew of her April 25, 2005 admissions . . . and . . . then she and I went through the transcript of the defendant's February 1, 2005 appearance.  I asked her, in question-by-question sequence which of her answers were false and she identified those that were false.  As she identified either an answer or a series of back-to-back answers as false, I had her initial that false answer (and/or bracket multiple false answers and initial the bracket), telling her that her initials indicated the answer was false, and she agreed.

Dkt. #12, ¶ 7.  Once the defendant entered the grand jury room, the following exchange transpired:

> Q:   And Ms. Fish, just for the record, I placed a transcript on the witness stand in front of you.  It appears to be your transcript in an appearance that you made before this grand jury on February 1st of 2005?
>
> A:   Uh-huh, yes.
>
> Q:   And you had a chance to review that before coming in here today?
>
> A:   Yes.
>
> Q:   And the person who testified on February 1st is Shawna Fish that is sitting in the witness stand right now?
>
> A:   Yes.
>
> Q:   I want to go through some things with you.  First of all, you're aware, are you not, that you have become a target of a grand jury investigation?
>
> A:   Yes.

Q:     So I'm going to go through and advise you as to your rights.  First of all, the answer to any question that is put to you here today that would tend to incriminate you, you have the right to refuse to answer the question.  Do you understand that?

A:     Yes.

Q:     Do you understand that any answer that you give can be used against you, it can be used against you by this grand jury, by another grand jury or in a court of law; do you understand that?

A:     Yes.

Q:     Also, you have the right to be represented here today by an attorney.  Your attorney can't be here in the room with you, he must remain outside in the hallway.  On the other hand, you do have the right to excuse yourself on a reasonable basis to confer with your attorney before answering my question or any question a juror might want to put to you.  Do you understand that?

A:     Yes.

Q:     Also, you understand and I think clearly understand that when you came in here you WERE [sic] administered an oath.  You have an obligation to tell the truth to this grand jury.  If at any time you make a material false statement to this grand jury or in other words, lie to the grand jury, you could be prosecuted for perjury or making a false declaration.  Do you understand that?

A:     Yes.

Q:     Now, I want to go through something else before we get to your testimony.  Would it be fair to say that prior to coming in here today we had some discussion with you concerning your prior testimony?

A:     Yes.

Q:     And concerning the fact that parts of your prior testimony were simply not true?

A:     Yes.

Q:     And you're going, after you are done here, over to see the US Magistrate for obtaining, for the purpose of obtaining an attorney?

A:     Yes.

Q:     Because you can't afford one?

A:     Yes.

Q:     And you'll proceed from there to resolve whatever legal difficulties you got yourself into with respect to your February 1st, 2005 appearance?

A:     Yes.

Q:     Including probably a plea of guilty to a perjury charge?

A:     Yes.

Q:     Now, you have before you your February 1st transcript?

A:     Uh-huh, yes.

Q:     And would it be fair to say before you came in here we went through that transcript with you to try to pick out the parts of your testimony that were false when you gave them back on February 1st?

A:     Yes.

\*   \*   \*

Q:     Basically you said you were at a meeting among the three of you shortly before Larry Kropp came into testify in front of the grand jury?

A:     Yes.

* * *

Q:     And in the course of that discussion, did Larry Kropp advise Dave Cain that he was subpoenaed to testify before the grand jury today?  I'm sorry, on that day you answered, no.  Question: Not at all?  Answer: No.  Then I asked you: Did the subject even come up and you answered: No.  Do you see that?

A:     Yes.

Q:     Would it be fair to say in answering no to that question you lied to the grand jury?

A:     Yes.

Q:     Then I asked you; were you privy to any discussions between Cain, Jr. and Larry Kropp when they discussed what Larry Kropp was going to tell the grand jury when he appeared before the grand jury and you answered, no?

A:     Yes.

Q:     Is it fair to say that the answer of no was a false statement?

A:     Yes, it was.

Q:     Now, can we go to page six - - actually, we will start at the bottom of page five.  I asked you a question: All right, let me go back.  Were you there in that jail with Kropp and Cain, Jr. when the subject came up what Kropp was going to tell the grand jury?  And you answered: It never came up.  Do you see that?

A:     Uh-huh.

Q:     Uh-huh means yes?

A:     Yes.

Q:     You have to answer.

A:     Yes.

Q:      I know that you're nervous but bear with me.  And you
        answered: It never came up.  Do you see that?

A:      Uh-huh, yes.

Q:      Would it be fair to say your answer, "never came up"
        was a false answer?

A:      Yes

Q:      And then I asked you: Certainly you were sitting close
        enough that was passed back and forth and you
        answered: Yes.  Then I asked you: You're telling the
        jury the subject of what Larry Kropp was going to tell
        the grand jury never came up?  And you answered:
        Not on that day.  Do you see that?

A:      Yes.

Q:      And you answered: Not on that day.  Was that a false
        statement?

A:      Yes.

Q:      Then I will ask you and get to that in a minute,
        your appearance before the grand jury never
        came up and you answered: No.  Was that no
        a false statement?

A:      Yes.

                          *    *    *

Q:      I'd like to go back to that discussion in jail among
        Larry Kropp and David Cain Jr. and ask you first of
        all; you were present, correct?

A:      Yes.

Q:      And did the subject of Larry Kropp come up [sic]
        before this grand jury, come up during the course of
        that discussion?

A:      Yes.

Q:      And were there instructions - - and I want to have a
        yes or no to this because we'll get to it in a minute - -
        were there instructions from David Cain to Larry
        Kropp about what he should say, what he should
        testify to in front of this grand jury?

A:      Yes.

*   *   *

Q:      Why don't you tell the grand jury as best you can
        recall the instructions that David Cain Jr. gave to
        Larry Kropp in that same setting before Larry Kropp
        appeared before the grand jury?

A:      To tell the grand jury that he didn't know.

Q:      Know about what?

A:      Know anything that they asked.  He didn't know.

Q:      And was this a series of instructions?  Was it just one
        sentence?  What was it?

A:      It was a conversation, you know.  They would
        talk about something and then it would be
        Dave would bring it back up.  You just tell them
        that you don't know.

*   *   *

Q:      So simply, anything that he asked, you don't know?

A       Exactly.

Q:      And David Cain was giving instructions and orders to
        Larry Kropp?

A:      And me.

Q:      And you?

A:      Yes.

*   *   *

-12-

Q:     And why was he giving instructions to you?

A:     Because I was to say the same thing, if ever asked, if ever subpoenaed and ever brought up here, I was to say the same thing.

Q:     Would it be fair to say in point in time when this conversation occurred only Larry Kropp was under subpoena?

A:     Yes.

Q:     David Kropp [sic] told you if you are ever called, you know nothing?

A:     Exactly.

Q:     You're to say nothing?

A:     Exactly.

Dkt. #10, Exh. D, pp.2-12.


## DISCUSSION AND ANALYSIS

**Defense of Ambiguous Questions/Literally True Answers**

The defendant argues that the government's questions were ambiguous

and that her responses before the grand jury on February 1, 2005 can be fairly

interpreted as literally true.  Dkt. #10, Pt. 4, p.7.  Specifically, the defendant argues that

> if the instruction from Cain to Kropp was not to say anything, but to tell the grand jury that he did not know, the answers to the questions posed on February 1, 2005, at least by one fair interpretation are literally true.  That is, Cain did not tell Kropp, or discuss with Kropp, what Kropp was going to tell the grand jury, but told him not to say anything. The witness's responses to the effect that no, it did not come up at that visit, and not on that day, should have been pursued with follow up questions – *e.g.*, "what do you mean, not that day?"

Dkt. #10, Pt. 4, p.7   In support of this argument, the defendant relies upon *Bronston v. United States*, 409 U.S. 352 (1973).  The defendant also argues that the indictment should be dismissed because the government cannot establish that the defendant believed her statement to be false.  Dkt. #10, p.14.

The government responds that this motion must be denied because the rule in this Circuit is that the issue of whether a statement is literally true is generally an issue for the jury to decide.  Dkt. #13, pp.2 & 5.

"A perjury conviction must rest on the utterance by the accused of a false statement; it may not stand on a particular interpretation that a questioner places upon an answer."  *United States v. Lighte*, 782 F.2d 367, 375 (2d Cir. 1986).  Thus, "an individual cannot be convicted of perjury for an answer given under oath that is literally true, even if it is unresponsive and intended to mislead." *United States v. Carey*, 152 F. Supp.2d 415, 423-34 (S.D.N.Y. 2001).  As the Supreme Court of the United States has clearly  instructed, "any special problems arising from the literally true but unresponsive answer are to be remedied through the 'questioner's acuity' and not by a federal perjury prosecution."  *Bronston v. United States*, 409 U.S. 352, 362 (1973).  In other words,

> the examiner's awareness of unresponsiveness should lead him to press another question or reframe his initial question with greater precision.  Precise questioning is imperative as a predicate for the offense of perjury.

*Id.*  "The burden is on the questioner to pin the witness down to the specific object of the questioner's inquiry."  *Id.* at 360-61.

"Whether an answer is literally true raises a factual question to be resolved by a jury." *Lighte*, 782 F.2d at 373.  However, a court may make the determination of literal truthfulness if the "defendant's answers were literally true 'under any conceivable interpretation of the questions.'"  *United States v. Subeh*, No. 04-CR-6077, 2006 WL 219968, at *12 (W.D.N.Y. Jan. 24, 2006), *quoting United States v. Carey*, 152 F. Supp.2d 415, 424 (S.D.N.Y. 2001).

"When a line of questioning is so vague as to be fundamentally ambiguous, the answers associated with the questions posed may be insufficient as a matter of law to support the perjury conviction." *Lighte*, 782 F.2d at 375 (internal quotation omitted).  "A question is fundamentally ambiguous when it is not a phrase with a meaning about which men of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time it were sought and offered as testimony." *Id.*  For example, where the prosecutor failed to distinguish his questions with respect to the witness in his individual capacity or his capacity as trustee, the witness' response to a question regarding his receipt of certain  proceeds could not be used to support a charge of perjury based upon the witness' receipt of proceeds in his capacity as trustee. *Id.* at 375-76; *see also United States v. Markiewicz*, 978 F.2d 786, 809 (2d Cir. 1992) (question's lack of specificity as to possession of funds in personal capacity or as employee carries it from the realm of imprecision into the terrain of fundamental ambiguity), *cert. denied sub. nom Beglen v. United States*, 506 U.S. 1086 (1993). Ambiguity in questioning may not be established by isolating a statement from context

to give it a meaning entirely different from that which it has when the testimony is considered as a whole.  *Id.* at 375.  In other words, the fact that the words used in the question have different meanings in different situations does not make them fundamentally ambiguous.  *Id.*

In the instant case, the questions posed to the defendant are neither literally true under any conceivable interpretation of the questions nor fundamentally ambiguous.  The colloquy between the prosecutor and the defendant at her first grand jury appearance does not foreclose a finding that the defendant's responses were knowingly false.  While there may be room for argument as to whether defendant's testimony that Larry Kropp never discussed what he was going to tell the grand jury is literally true in light of her subsequent testimony that it was Cain who was instructing Kropp to tell the grand jury that he didn't know anything, the defendant also denied that Larry Kropp's appearance before the grand jury was even discussed.  This question, *to wit*, did the subject of Larry Kropp's subpoena to testify before the grand jury even come up, is not fundamentally ambiguous.  Thus, it is recommended that a jury be permitted to resolve the factual questions presented with respect to the truthfulness of the defendant's testimony before the grand jury.

**Recantation Defense**

The defendant argues that the recantation defense set forth in 18 U.S.C. § 1623(d) should bar this prosecution because she corrected her testimony before it

substantially affected the proceeding and before it was manifest that the falsity of her

original testimony had been exposed.  Dkt. #10, pp. 9-10.


The government responds that the defendant did not recant, but merely

confessed upon confrontation by government agents.  Dkt. #13, pp.3-4.  The

government also asserts that the defendant's initial testimony delayed and hindered the

investigation of David Cain, Jr. for witness tampering.  Dkt. #13, p.4.  Accordingly, the

government argues that the defendant is unable to establish either prong of the

recantation defense.  Dkt. #13, pp.3-5.


18 U.S.C. § 1623(d) sets forth a complete defense to a charge of perjury

before the grand jury.  *United States v. Awadallah*, 202 F. Supp.2d 17, 36 (S.D.N.Y.

2002).  Specifically, the statute provides that

> Where, in the same continuous court or grand jury
> proceeding in which a declaration is made, the person
> making the declaration admits such declaration to be false,
> such admission shall bar prosecution under this section if, at
> the time the admission is made, the declaration has not
> substantially affected the proceeding, or it has not become
> manifest that such falsity has been or will be exposed.

Although the conditions for application of the recantation defense are set forth in the

disjunctive, the Court of Appeals for the Second Circuit has determined "that

recantation is an effective bar to prosecution only if the false statement has not

substantially affected the proceeding *and* if it has not become manifest that the falsity

has been or will be exposed."  *United States v. Fornaro*, 894 F.2d 508, 511 (2d Cir.

1990); *cf. United States v. Smith*, 35 F.3d 344, 346 (8th Cir. 1994) (recognizing other

circuit courts of appeals had construed "or" to mean "and," but deciding to accord the word "or" its ordinary meaning and read the statute as setting forth two alternative conditions, satisfaction of either of which would allow a declarant to employ the recantation defense to bar prosecution for perjury).  Thus, in this circuit, both conditions must be fulfilled in order to bar a prosecution for perjury.  *Fornaro,* 894 F.3d at 510-11.

The defense can only be invoked if the defendant unequivocally admits that his allegedly perjurious statements were false.  *See United States v. D'Auria*, 672 F.2d 1085, 1091-92 (2d Cir. 1982); *Awadallah*, 202 F. Supp.2d at 37.  "The proper test to apply . . . when determining whether recantation occurred before imminent exposure was manifest, is whether the fact that the statements have been or will be exposed as false is objectively manifest to the declarant."  *Awadallah*, 202 F. Supp.2d at 38, *quoting United States v. Smith*, 35 F.3d 344, 347 (8th Cir. 1994).  The focus is on "the witness's knowledge, gained either from independent sources or from the prosecutor.*"  United States v. Tucker*, 495 F. Supp. 607 (E.D.N.Y. 1980).

"Whether a valid offer to recant has been made is an issue of law that must be decided by the court."  *See D'Auria*, 672 F.2d at 1091; *see also Fornaro*, 894 F.2d at 511; *Awadallah*, 202 F. Supp.2d at 37.  It is unclear, however, whether the defendant bears the burden of establishing that the recantation defense applies or if the government is required to demonstrate that the defense is inapplicable.  *See Awadallah*, 202 F. Supp.2d at 37, n.19 (noting that the Court of Appeals for the Second

Circuit has not yet addressed the issue and those Courts of Appeals which have addressed the issue have split).

Assuming, *arguendo*, that the government was required to establish that the defense is inapplicable, the government has met its burden.  The indictment charges that it was material to the grand jury's investigation to determine if the targets of its investigation of extortion had corruptly influenced, or attempted to corruptly influence, the testimony of any witness who had testified before the grand jury or would testify before the grand jury in the future.  Dkt. #1.  The prosecutor affirms that the defendant was subpoenaed before the grand jury on February 1, 2005 with the expectation that her testimony would establish that David Cain, Jr. tampered with Larry Kropp.  Dkt. #12, ¶ 5.  Thus, the defendant's denial of any discussion between David Cain, Jr. and Larry Kropp with respect to Larry Kropp's subpoena to testify before the grand jury substantially affected the grand jury's ability to assess David Cain, Jr.'s attempts to exercise influence over witnesses before the grand jury.  Since the government has established that the defendant's February 1, 2005 testimony substantially affected the proceeding, the defendant is not entitled to dismissal pursuant to the Court of Appeals for the Second Circuit's interpretation of the recantation defense.

If the statute were read in the disjunctive, the Court would require a hearing to assess whether it was objectively manifest to the defendant that her false statements had been or would be exposed before she recanted.  It is unclear from

Investigator Weidel's affidavit whether he or Special Agent Bernhard informed the

defendant that Larry Kropp had admitted the falsity of his grand jury testimony, thereby

exposing the defendant's false statements, or whether they otherwise confronted the

defendant with information to suggest knowledge of her false statements.  Since the

government has met its burden of establishing that the declaration substantially

affected the proceeding, however, the defendant cannot avail herself of the recantation

defense even if the government was ultimately unable to establish that her admission

followed knowledge of the exposure or imminent exposure of the falsity of her

statements.  Accordingly, it is recommended that the defendant's motion to dismiss the

indictment as barred by the recantation defense be denied.


**<u>Materiality</u>**

The defendant argues that any false statement was immaterial to the

grand jury's investigation.  Dkt. #10, p.15.  Specifically, the defendant asserts that "the

government's attempt to manufacture a perjury conviction against a defendant who was

never called to testify concerning any issue addressed to the substance of the grand

jury's investigation, should be dismissed as a matter of law."  Dkt. #10, p.16.


The government responds that the defendant's arguments are properly

reserved for consideration by the jury.  Dkt. #13, pp.5-6.


A "misrepresentation is material if it has a natural tendency to influence, or

was capable of influencing, the decision of the decisionmaking body to which it was

addressed." *Kungys v. United States*, 485 U.S. 759, 770 (1988) (internal quotation omitted).  Materiality of the false statement is an element of perjury which must be decided by the jury.  *Johnson v. United States*, 520 U.S, 461, 465 (1997).  Thus, a jury should determine whether the defendant's statements on February 1, 2005, influenced the grand jury's determination with respect to the propriety of making additional charges against David Cain, Jr.

**Perjury Trap Defense**

The defendant argues that the government solicited the defendant's May 3, 2005  testimony with the premeditated design of indicting her for perjury, thereby violating her constitutional right to due process.  Dkt. #10, pp.16-17.  In support of this argument, the defendant relies upon the prosecutor's statement that the defendant should proceed to the chambers of the United States' Magistrate Judge to obtain an assigned attorney after her testimony before the grand jury.  Dkt. #10, p.17.

The government responds that, even assuming that the perjury trap defense is a viable defense, it cannot apply because the defendant's May 1, 2005 appearance was secured to elicit truthful testimony.  Dkt. #13, pp.6-7.

A perjury trap is created when the government calls a witness for the primary purpose of obtaining testimony from him in order to prosecute him later for perjury.  *Wheel v. Robinson*, 34 F.3d 60, 67 (2d Cir. 1994), *quoting United States v. Chen*, 933 F.2d 793, 796-97 (9th Cir. 1991), *cert. denied*, 514 U.S. 1066 (1995).  The

Court of Appeals has yet to decide whether the perjury trap defense is available in the Second Circuit.  *See United States v. Regan*, 103 F.3d 1072, 1079 (2d Cir.), *cert. denied*, 521 U.S. 1106 (1997)*; Wheel*, 34 F.3d at 67-68.  However, the Court of Appeals noted that the perjury trap doctrine would not apply if there was a legitimate basis for an investigation and for asking the particular questions which were answered falsely.  *Regan*, 103 F.3d at 1079, *quoting Wheel*, 34 F.3d at 68.

As it is clear that the government had a legitimate basis for its investigation of Mr. Cain's interactions with potential witnesses and that the questions posed to the defendant were in furtherance of that investigation, it is recommended that this aspect of the defendant's motion to dismiss the indictment be denied without speculating as to whether the Court of Appeals for the Second Circuit would recognize the defense upon a proper factual predicate.

## Outrageous Government Conduct

The defendant argues that the prosecutor engaged in outrageous conduct which deprived the defendant of her rights pursuant to the Fifth and Sixth Amendments to the United States Constitution by failing to advise her that she could have an attorney appointed to represent her prior to her grand jury testimony on May 3, 2005.  Dkt. #10, pp.17-21.  The defendant seeks either outright dismissal of the indictment or, alternatively, suppression of her May 3, 2005 grand jury testimony.  Dkt. #10, p.19.

The government responds that the defendant was aware that she had become a target of the grand jury's investigation and was given a standard "advice of rights" at the commencement of her May 3, 2005 appearance before the grand jury. Dkt. #13, p.8.  Accordingly, the government denies any prosecutorial misconduct.  Dkt. #13, p.10.

The law vests the grand jury with substantial powers, including the authority to compel the attendance and testimony of witnesses.  *United States v. Mandujano*, 425 U.S. 564, 571-72 (1976).  This power is subject to the individual's right to invoke the constitutional privilege to avoid self-incrimination, which can be overcome only by a grant of immunity.  *Id.* at 574-75.  As the Court explained:

> Immunity is the Government's ultimate tool for securing testimony that otherwise would be protected; unless immunity is conferred, however, testimony may be suppressed, along with its fruits, if it is compelled over an appropriate claim of privilege.  On the other hand, when granted immunity, a witness once again owes the obligation imposed upon all citizens – the duty to give testimony – since immunity substitutes for the privilege.

*Id.* at 576.  The Supreme Court has made absolutely clear that within this framework for securing testimony before a grand jury, "perjury simply has no place whatsoever."  *Id.* Thus, sanctions for false statements or perjury are permissible "even in instances where the perjurer complained that the Government exceeded its constitutional powers in making the inquiry."  *Id.* at 577.  As the Supreme Court reiterated:

> [I]t cannot be thought that as a general principle of our law a citizen has a privilege to answer fraudulently a question that the Government should not have asked.  Our legal system provides methods for challenging the Government's right to ask questions – lying is not one of them.

*Id., quoting Bryson v. United States*, 396 U.S. 64, 72 (1969).  In other words, the "[Fifth Amendment] privilege cannot be construed to include the right to commit perjury."  *Id.* at 583, *quoting Harris v. New York*, 401 U.S. 222, 225 (1971).


Applying this analysis to the instant case, it is clear that there is no constitutional basis for protecting the defendant from the consequences of any false statements made to the grand jury on February 1, 2005.  The defendant was not a target of the grand jury's investigation and the questions asked of the defendant did not seek responses which would incriminate her.  Thus, the defendant had an obligation to testify truthfully before the grand jury and should be held responsible for any failure to meet that obligation.


The defendant's testimony before the grand jury on May 3, 2005 obviously afforded the grand jury highly probative evidence with respect to its investigation of David Cain, Jr.'s attempts to influence witnesses before the grand jury.  The prosecutor's colloquy with the defendant makes clear, however, that her testimony  was also elicited for the express purpose of substantiating a perjury indictment against the defendant.  Although the defendant was advised that she had become a target of the grand jury's investigation; that she had the right to refuse to answer any question that would incriminate her; that any answer could be used against her by another grand jury or in a court of law; and that she had the right to consult with an attorney, she was not advised that she could have counsel appointed to represent her prior to testifying before the grand jury.  The prosecutor opined at oral argument that this omission was

proper because the defendant had no Sixth Amendment right to counsel prior to indictment.  The Court believes that this statement of law is insufficient to resolve the question presented.

In *Mandujano,* the United States Supreme Court was presented with the question of whether the warnings called for by *Miranda v. Arizona*[1] must be given to a grand jury witness who was called to testify about criminal activities in which he may have been personally involved.  *Id.* at 566.  Distinguishing between the compulsion thought to be inherent in custodial police interrogation and the procedural safeguards inherent in grand jury investigations, the plurality opinion, authored by Chief Justice Burger and joined by Justices White, Powell and Rehnquist, found no basis for extending the rationale of *Miranda* to the grand jury room.  *Id.* at 579-80.  The plurality opinion also noted that the warnings set forth in *Miranda* were not accurate with respect to a witnesses' rights and responsibilities before the grand jury.  *Id.* at 580-81.

Upon review of the warnings volunteered by the prosecutor, the plurality opinion found it sufficient, as relevant to the instant case, that the witness had been "informed that if he desired he could have the assistance of counsel, but that counsel could not be inside the grand jury room."  *Id.* at 581.  Specifically, the prosecutor asked the witness:

Q:      Have you contacted a lawyer in this matter?

A:      I don't have one.  I don't have the money to get one.

---

[1] 384 U.S. 436 (1966).

> Q:     Well, if you would like to have a lawyer, he cannot be
>         inside this room.  He can only be outside.  You would
>         be free to consult with him if you so chose.  Now, if
>         during the course of this investigation, the questions
>         that we ask you, if you feel like you would like to have
>         a lawyer outside to talk to, let me know.

*Id.* at 567-68.  The plurality opinion reasoned that

> That statement was plainly a correct recital of the law.  No
> criminal proceedings had been instituted against
> respondent, hence the Sixth Amendment right to counsel
> had not come into play.  *Kirby v. Illinois*, 406 U.S. 682 . . .
> (1972).[2]  A witness "before a grand jury cannot insist, as a
> matter of constitutional right, on being represented by his
> counsel . . . ."  *In re Groban*, [352 U.S. 330, 333 (1957)]. [3]
> Under settled principles the witness may not insist upon the
> presence of his attorney in the grand jury room.  Fed.Rule
> Crim.Proc. 6(d).

*Id.* at 581 (footnote omitted).


Justices Brennan and Marshall concurred in the judgment of the Court[4] on

the grounds that the privilege against self-incrimination did not protect an individual

from prosecution for making false statements and that the record did not suggest that

the witness' false statements were "induced by governmental tactics or procedures so

---

[2] As recognized by the concurring opinion, the Court noted at the outset of their decision in *Kirby* "that the constitutional privilege against compulsory self-incrimination is in no way implicated here."  *Kirby*, 406 U.S. at 687*; see Mandujano*, 425 U.S. at 602-03.

[3] The *Groban* decision continued by recognizing that until criminal charges are made against the witness, "his protection is the privilege against self-incrimination." 352 U.S. at 333.  The Court further noted that any "improper exercise of opportunity to examine . . . may be corrected . . . for example, by excluding from subsequent prosecutions evidence improperly obtained."  *Id.* at 334.

[4] Justices Stewart and Blackmun also concurred in the judgment, but did not think it necessary to go beyond the proposition that the "Fifth Amendment privilege against self-incrimination provides no protection for the commission of perjury" to resolve the case.  *Id.* at 609.  Justice Stevens took no part in the consideration or decision of this case.  *Id.* at 584.

inherently unfair under all the circumstances as to constitute a prosecution for perjury

[in] violation of the Due Process Clause of the Fifth Amendment," but wrote separately

out of "duty to supply the jurisprudential foundation necessary to ensure that Fifth

Amendment values are adequately preserved when threatened in the context of a

putative defendant called by a prosecutor and interrogated before a grand jury

concerning personal acts for which the prosecution plans his criminal indictment."  *Id.* at

585 & 587.  The Justices recognized that

> the rule that a witness must claim the privilege is consistent
> with the fundamental purpose of the Fifth Amendment – the
> preservation of our adversary system of criminal justice. . . .
> *That system is undermined when a government deliberately
> seeks to avoid the burdens of independent investigation by
> compelling self-incriminating disclosures*.

*Id.* (emphasis in original)*, quoting Garner v. United States*, 424 U.S. 648, 655-656

(1976).  They also recognized that

> the question of whether the guidance of counsel is ordinarily
> required to enable an individual effectively to avoid prejudice
> to his Fifth Amendment privilege was clearly answered by
> this Court last Term.
>> "The assertion of a testimonial privilege, as of
>> many other rights, often depends upon legal
>> advice from someone who is trained and
>> skilled in the subject matter, and who may offer
>> a more objective opinion.  A layman may not
>> be aware of the precise scope, the nuances,
>> and boundaries of his Fifth Amendment
>> privilege.  It is not a self-executing mechanism;
>> it can be affirmatively waived, or lost by not
>> asserting it in a timely fashion."  *Maness v.
>> Meyers*, 419 U.S. 449, 466 . . . (1975).
> Given the inherent danger of subversion of the adversary
> system in the case of a putative defendant called to testify
> before a grand jury, and the peculiarly critical role of the Fifth
> Amendment privilege as the bulwark against such abuse, it
> is plainly obvious that some guidance by counsel is required.

> This conclusion entertains only the "realistic recognition of
> the obvious truth that the average [putative] defendant does
> not have the professional legal skill to protect himself when
> brought before a tribunal . . . wherein the prosecution is
> [represented] by experienced an learned counsel." *Johnson
> v. Zerbst,* [304 U.S. 458, 462-63 (1938)]; *Schneckloth v.
> Bustamonte*, 412 U.S. 218, 236 (1973)].

*Id.* at 604-05.

> As a matter of procedure, Justices Brennan and Marshall opined that

> It may be that a putative defendant's Fifth Amendment
> privilege will be adequately preserved by a procedure
> whereby, in addition to warnings, he is told that he has a
> right to consult with an attorney prior to questioning, that if
> he cannot afford an attorney one will be appointed for him,
> that during the questioning he may have that attorney wait
> outside the grand jury room, and that he may at any and all
> times during questioning consult with the attorney prior to
> answering any question posed. At least if such minimal
> protections were present, a putative defendant would be
> able to consult with counsel prior to answering any question
> that he might in any way suspect may incriminate him.

*Id.* at 605-06 (internal citations omitted).  The Justices noted that the feasibility of such

a procedure was "clearly manifested by the plethora of reported instances in which just

such procedures have been followed."  *Id.* at 606 (footnote omitted).

The Court, based on its own experience on numerous occasions, takes

judicial notice of the practice of the United States Attorney's Office in this district,

consistent with the practice recognized by the Supreme Court and utilized by the

government in the *Mandujano* case, of advising grand jury targets of the opportunity to

apply for assigned counsel.  In the instant case, however, the prosecutor conceded at

oral argument that he declined to offer the defendant the opportunity to obtain assigned

counsel prior to her May 3, 2005 grand jury testimony, even though the grand jury

transcript indicates he was aware that the defendant was unable to afford to retain

counsel, because it was "our desire to get a confession" from the defendant.  Such

conduct cannot be countenanced by this Court.  *See Garner,* 424 U.S. at 655-56

(adversary system of criminal justice "is undermined when a government deliberately

seeks to avoid the burdens of independent investigation by compelling self-incriminating

disclosures."); *United States v. Jacobs*, 547 F.2d 772, 775 (2d Cir. 1976) (suppressing

grand jury testimony where the prosecutor deviated from uniform policy of advising a

witness that he was a target of the grand jury not because such deviation violated the

witness' constitutional rights, but because the Court determined that "it is an important

function of the administration of criminal justice to let our citizens know that equal

justice is available to all . . . .").


Accordingly, it is recommended that the government be precluded from

introducing the defendant's May 3, 2005 grand jury testimony against the defendant at

trial.  This remedy prevents the government from profiting from its refusal to afford the

defendant an opportunity to obtain assigned counsel before she incriminated herself

before the May 3, 2005 grand jury, while still permitting the government to present

independent evidence to hold the defendant accountable for any false statements she

may have made before the February 1, 2005 grand jury.  *See United States v.*

*Rivieccio*, 919 F.2d 812, 816 (2d Cir. 1990) (collecting cases demonstrating that the

proper remedy for an indictment based on evidence obtained in violation of the privilege

against self-incrimination is not dismissal of the indictment, but suppression at trial of the defendant's compelled testimony), *cert. denied,* 501 U.S. 1230 (1991).

## CONCLUSION

_____Based on the foregoing, it is hereby **RECOMMENDED** that defendant's motion to dismiss the indictment be **DENIED** and that defendant's motion to suppress her May 3, 2005 grand jury testimony be **GRANTED**.  Dkt. ##10 & 11.

Accordingly, pursuant to 28 U.S.C. § 636(b)(1), it is hereby

 **ORDERED** that this Report, Recommendation and Order be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Crim.P. 58(g)(2) and Local Rule 58.2.

The district judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance.  *See, e.g., Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988). **Failure to file objections within the specified time or to request an extension of**

**such time waives the right to appeal the District Judge's Order**.  *Thomas v. Arn*,

474 U.S. 140 (1985); *Wesolek, et al. v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir.

1988).


The parties are reminded that, pursuant to Rule 58.2 of the Local Rules

for the Western District of New York, "written objections shall specifically identify the

portions of the proposed findings and recommendations to which objection is made and

the basis for such objection and shall be supported by legal authority." **Failure to**

**comply with the provisions of Rule 58.2, or with the similar provisions of**

**Rule 58.2 (concerning objections to a Magistrate Judge's Report,**

**Recommendation and Order), may result in the District Judge's refusal to**

**consider the objection.**

/s/ H. Kenneth Schroeder, Jr

_____
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**


**DATED:**      **Buffalo, New York**
              **April 28, 2006**