UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,


                              v.                              DECISION AND ORDER
                                                              05-CR-228A

SHAWNA FISH,

                              Defendant.
_____


## INTRODUCTION

         The defendant, Shawna Fish, is charged in a one-count indictment with

unlawfully, willfully and knowingly making false material declarations to the grand jury,

in violation of 18 U.S.C. § 1623.  Fish filed a motion seeking dismissal of the indictment

and suppression of her May 3, 2005 grand jury testimony.  The matter was referred to

Magistrate Judge Schroeder pursuant to 28 U.S.C. § 636(b)(1).  On May 2, 2006,

Magistrate Judge Schroeder issued a report and recommendation, recommending that

defendant's motion to dismiss be denied, but that her motion to suppress be granted.

         Both parties filed objections to the report and recommendation.  Fish

objected to the Magistrate Judge's recommendation that her motion to dismiss the

indictment be denied, and the government objected to the Magistrate Judge's

recommendation that Fish's May 3rd grand jury testimony be suppressed.  Upon review

of the objections, this Court determined that an evidentiary hearing was required.  A

hearing was held on August 29 and 30, 2006.  Following the hearing, the parties

provided supplemental submissions and the Court heard oral argument on November 14, 2006.  For the reasons stated, the Court hereby denies the motion to dismiss and to suppress in its entirety.

## BACKGROUND

Pursuant to a grand jury investigation of potential crimes committed by an individual named David Cain, Jr. ("Cain"), numerous individuals were subpoenaed to testify before the grand jury, including an individual named Larry Kropp, the defendant's boyfriend.  Kropp was subpoenaed to testify on December 7, 2004, but did not actually testify that day.  Instead, he testified before the grand jury on January 4, 2005.

During Kropp's January 4, 2005 grand jury testimony, he was asked whether he had ever discussed the issue of his grand jury appearance with Cain, and Kropp answered "no".  That question was posed to Kropp in part because the grand jury was investigating, *inter alia*, whether Cain had corruptly influenced or attempted to corruptly influence the testimony of grand jury witnesses.

Following Kropp's appearance, the Assistant United States Attorney ("AUSA") in charge of the investigation, Anthony Bruce, asked Niagara County Police Investigator Patrick Weidel to check the prison logs for the Niagara County Jail (where Cain was being detained) to determine whether Kropp had visited Cain.  The prison logs indicated that both Kropp and Fish had visited Cain on December 7, 2004, the same date that Kropp was initially subpoenaed to testify.

2

Shortly thereafter, the grand jury subpoenaed Fish to testify on February 1, 2005.  Fish appeared pursuant to the subpoena and was advised by AUSA Bruce as follows:

> Ms. Fish, you're not a target or a subject in this Grand Jury's investigation but I will warn you based upon prior discussions with you, you came in this room and you gave an oath to tell the truth to the Grand Jury and you know I think from our prior discussions that should you make a false statement to this Grand Jury you could be prosecuted for perjury?

See Tr. of Feb. 1 2005 Grand Jury proceedings, at 2.  Fish responded affirmatively.  She was then asked whether she drove Kropp to his grand jury appearance in December 2005.  She admitted that she had, and that on that same date, she and Kropp drove to the Niagara County Jail to meet with Cain for approximately one hour before Kropp's grand jury appearance.

The AUSA then asked Fish whether Cain and Kropp discussed the issue of Kropp's grand jury testimony.  Fish testified that the subject of Kropp's grand jury testimony "never came up" and that she was sitting close enough to hear the entire conversation.  Id.

Nothing further occurred with regard to this aspect of the investigation until April 21, 2005, when Investigator Weidel re-interviewed Kropp.[1]  Kropp had been arrested on an unrelated driving while intoxicated charge and wanted to cooperate with authorities to reduce that charge.  During the re-interview, Kropp admitted to Wiedel

---

[1]  It is not clear whether this meeting occurred on April 21st or April 23rd.  Weidel and Bernhard testified at the hearing that the meeting occurred on April 21st, but earlier court documents indicate that the meeting occurred on April 23rd.  This de minimus discrepancy in dates is of no consequence.  It is clear that the meeting occurred shortly after Kropp was arrested on DWI charges.

and ATF Special Agent Jason Bernhard (who was also present) that he had lied during his initial grand jury testimony and that he had in fact discussed the issue of his grand jury testimony with Cain.  Kropp also admitted that Cain had told him not to tell the grand jury anything.  See Tr. of April 2006 hearing, at 11.

Four days later, on April 25, 2005, Investigator Weidel received a telephone message from Fish.  When Weidel returned her call, Fish requested an opportunity to meet with him.  Tr. of April 2006 hearing, at 13.  Fish did not mention what she wanted to discuss, but Weidel suspected that it related to Kropp's confession.  Tr. of April 2006 hearing, at 18.  Fish voluntarily appeared at Weidel's office later that morning.  Special Agent Bernhard was also present for that meeting.

When Fish arrived, Weidel and Bernhard initiated the conversation[2] and explained that Kropp had admitted lying to the grand jury about his December 2004 conversation with Cain at the Niagara County Jail.  They told her that they believed that she had also been untruthful and that if she wanted to correct that, she should do so.  Tr. of April 2006 hearing, at 19.  Fish readily admitted to lying to the grand jury.  They advised her that she would have to appear before the grand jury to correct her testimony.  She readily agreed to do that.  Tr. of April 2006 hearing, at 21.  There was no discussion or suggestion that Fish was potentially facing any perjury charges.  Weidel testified that, since Fish had requested the meeting, had appeared voluntarily

---

[2]    Weidel testified that he initiated the conversation "just to move things ahead" but that he "had a pretty good idea as to why she was there."  Tr. at 20.

4

and was free to leave at any time, she was not given any <u>Miranda</u> warnings[3] at any time during that meeting.

Weidel contacted AUSA Bruce and advised him of Fish's perjury confession.  AUSA Bruce immediately faxed over a grand jury subpoena commanding her to appear before the grand jury on May 3, 2005.  Weidel served the subpoena on Fish before she left the meeting.  Tr. of April 2006 hearing, at 23-27.  Contrary to Department of Justice policy, the subpoena did not contain the "advice of rights" warning that ordinarily accompanies a grand jury subpoena issued to a target witness.[4] Tr. of April 2006 hearing, at 97.

---

[3]    <u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436, 479 (1966) (mandating that a defendant subject to a custodial police interrogation be advised "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.").

[4]    The United States Attorney's Manual, 9-11.151, advises that a grand jury subpoena issued to a "target" of a grand jury investigation (i.e. an individual who, in the judgment of the prosecutor, is a putative defendant) should advise the witness as follows:

> - The grand jury is conducting an investigation of possible violations of federal criminal law;
>
> - You may refuse to answer any question if a truthful answer to the question would tend to incriminate you;
>
> -Anything that you do say may be used against you by the grand jury or in a subsequent legal proceeding; and
>
> -If you have retained counsel, the grand jury will permit you a reasonable opportunity to step outside the grand jury room to consult with counsel.

<u>See</u> U.S. Attorney's Manual, 9-11.151.

On May 3, 2005, upon arriving to testify again before the grand jury, Fish was brought into a small interview room and was asked by Weidel to identify the specific portions of her February 1st grand jury testimony that were false.  Tr. of April 2006 hearing, at 27-30.  Weidel testified that Fish was "amicable" and voluntarily identified the false statements. Tr. of April 2006 hearing, at 29.  AUSA Bruce entered the room and joined in the discussion.  He advised Fish that she would likely be charged with perjury, at which point she became visibly "agitated."  Tr. of April 2006 hearing, at 30, 33.  According to AUSA Bruce:

> I told her that I wanted to put her in the grand jury, that I wanted to get everything straightened out in front of the grand jury.  I told her that she had problems that – that the chances are that she would be charged.  And I told her that we would take steps to get her in front of the magistrate so that she could get a lawyer to handle whatever was going to happen.

Tr. of April 2006 hearing, at 61.  Fish never requested to speak with an attorney.  Fish was never advised of her <u>Miranda</u> rights or told that she could have counsel appointed before testifying despite AUSA Bruce's awareness that she could not afford an attorney.[5] Tr. at 29, 35, 62-69.

After the pre-testimony interview ended, the defendant was brought before the grand jury whereupon the following exchange took place:

> Q:     And Ms. Fish, just for the record, I placed a transcript on the witness stand in front of you.  It appears to be your transcript in an appearance that you made before this grand jury on February 1st of 2005?

---

[5]        The Transcript of Fish's May 3rd grand jury appearance indicates that AUSA Bruce was aware of her inability to afford counsel.  <u>See</u> Tr. of May 3, 2005 grand jury proceedings, at 4.

A:    Uh-huh, yes.

Q:    And you had a chance to review that before coming in here today?

A:    Yes.

Q:    And the person who testified on February 1st is Shawna Fish that is sitting in the witness stand right now?

A:    Yes.

Q:    I want to go through some things with you.  First of all, you're aware, are you not, that you have become a target of a grand jury investigation?

A:    Yes.

Q:    So I'm going to go through and advise you as to your rights.  First of all, the answer to any question that is put to you here today that would tend to incriminate you, you have the right to refuse to answer the question.  Do you understand that?

A:    Yes.

Q:    Do you understand that any answer that you give can be used against you, it can be used against you by this grand jury, by another grand jury or in a court of law; do you understand that?

A:    Yes.

Q:    Also, you have the right to be represented here today by an attorney.  Your attorney can't be here in the room with you, he must remain outside in the hallway.  On the other hand, you do have the right to excuse yourself on a reasonable basis to confer with your attorney before answering my question or any question a juror might want to put to you.  Do you understand that?

A:    Yes.

7

Q:      Also, you understand and I think clearly
        understand that when you came in here you
        WERE [sic] administered an oath.  You have
        an obligation to tell the truth to this grand jury.
        If at any time you make a material false
        statement to this grand jury or in other words,
        lie to the grand jury, you could be prosecuted
        for perjury or making a false declaration.  Do
        you understand that?

A:      Yes.

Q:      Now, I want to go through something else
        before we get to your testimony.  Would it be
        fair to say that prior to coming in here today we
        had some discussion with you concerning your
        prior testimony?

A:      Yes.

Q:      And concerning the fact that parts of your prior
        testimony were simply not true?

A:      Yes.

Q:      And you're going, after you are done here, over to
        see the US Magistrate for obtaining, for the purpose
        of obtaining an attorney?

A:      Yes.

Q:      Because you can't afford one?

A:      Yes.

Q:      And you'll proceed from there to resolve whatever
        legal difficulties you got yourself into with respect to
        your February 1st, 2005 appearance?

A:      Yes.

Q:      Including probably a plea of guilty to a perjury
        charge?

A:      Yes.

8

> Q:     Now, you have before you your February 1st transcript?
>
> A:     Uh-huh, yes.
>
> Q:     And would it be fair to say before you came in
>        here we went through that transcript with you
>        to try to pick out the parts of your testimony
>        that were false when you gave them back on
>        February 1st?
>
> A:     Yes.

Fish then proceeded to admit to the grand jury that certain portions of her February 1st grand jury testimony were false.  Following her testimony, AUSA Bruce contacted Magistrate Judge Schroeder's chambers and requested that counsel be appointed for her.  Thereafter, on September 6, 2005, she was indicted on one count of perjury in violation of 18 U.S.C. § 1623.

## DISCUSSION

**A.    Recantation Defense**

The defendant moves to dismiss the indictment arguing that her perjury prosecution is barred by the recantation defense set forth in 18 U.S.C. § 1623(d), which provides:

> Where, in the same continuous court or grand jury
> proceeding in which a declaration is made, the person
> making the declaration admits such declaration to be false,
> such admission shall bar prosecution under this section if, at
> the time the admission is made, the declaration has not
> substantially affected the proceeding, or it has not become
> manifest that such falsity has been or will be exposed.

See 18 U.S.C. § 1623(d).  The recantation defense "'serves as an inducement to [a grand jury] witness to give truthful testimony by permitting him voluntarily to correct a false statement without incurring the risk of prosecution (by) doing so.'"  See United States v. Denison, 663 F.2d 611, 616 (5th Cir. 1981) (quoting H. R. Rep. No. 91-1549, 91st Cong., 2d Sess., reprinted in U.S. Code Cong. & Admin. News, 4007, 4024 (1970)). To qualify for the defense, the defendant must establish two criteria.  First, the defendant must recant before the false statement has "substantially affected" the proceeding.  Second, the defendant must recant before it has become manifest that her falsity has been or will be exposed.  As the Second Circuit explained in United States v. Fornaro, 894 F.2d 508 (2d Cir. 1990):

> [R]ecantation is an effective bar to prosecution only if the false statement has not substantially affected the proceeding *and* if it has not become manifest that the falsity has been or will be exposed.

Id. at 511 (emphasis in original).[6]

With regard to the latter factor, the defendant must recant her false testimony *before* it becomes apparent to her that the falsity of her testimony has been or will be exposed.  See Denison, 663 F.2d at 615.  In Denison, the Fifth Circuit explained the "policy considerations" underlying this requirement:

---

[6]  Although the statute reads in the disjunctive, the Second Circuit, adopting the reasoning of the District of Columbia Circuit in United States v. Moore, 613 F.2d 1029 (D.C. Cir. 1979), cert. denied, 446 U.S. 954 (1980), held "that the 'or' in section 1623(d) should be read as 'and.'"  See Fornaro, 894 F.2d at 511.  Defendant notes that other circuits disagree and hold that the recantation defense is met if *either* of the two elements are satisfied.  This Court is bound to adhere to the law of the Second Circuit, which holds *both* elements of the recantation defense must be met.

> The purpose of barring the prosecution of witnesses who recant is to promote the investigations of the grand jury or of the court. There is little benefit to these investigations in permitting a witness to escape prosecution by recanting after it is clear to him that his perjury will be exposed. Such a rule would encourage a witness to testify falsely knowing he could always recant if evidence of his perjury comes to light. Congress did not intend to create so broad a shield when it passed § 1623(d).

See Denison, 663 F.2d at 616 (footnote omitted).  Therefore, "when it is manifest to a witness that his false testimony has been or will be exposed, he may no longer come under the shelter of the recantation provision."  Id.

The facts developed at the hearing demonstrated that Fish does not qualify for this defense because at the time she recanted, it was simply too late.  Fish gave her false testimony on February 1, 2005.  She made no effort to recant or otherwise correct her testimony until April 25, 2005, when she voluntarily contacted Investigator Weidel and requested a meeting.  The Court has no doubt that Fish made an "outright retraction and repudiation" of her earlier false testimony on April 25th.  See United States v. D'Auria, 672 F.2d 1085, 1092 (2d Cir. 1982) (stating that the defendant must provide an "outright retraction" of the earlier false testimony).  It was also clear that she arranged for the meeting so that she could do so.  Nevertheless, at the time that the retraction was made, it was apparent to Fish that the falsity of her February 1st testimony had been exposed.  She came in to recant just days after Kropp had already confessed to Weidel and Berhnard that he lied when he denied discussing the issue of his grand jury testimony with David Cain.  Because Fish, by her own admission, was there for that conversation (between Kropp and Cain), it was apparent to the government on April 21st (when Kropp confessed) that Fish had also committed perjury

when she denied that the conversation had occurred.  This is so even if Kropp never explicitly implicated Fish in his confession.  By implicating himself, Kropp necessarily implicated Fish.

The defendant argues that it was the government's burden to prove that the defendant did not qualify for the recantation defense and that it failed to meet its burden.  As Magistrate Judge Schroeder correctly noted, the issue of who bears the burden of establishing the recantation defense is unsettled and the Second Circuit has yet to rule on that issue.  <u>See</u> Report and Recommendation, at 18-19 (citing <u>United States v. Awadallah</u>, 202 F. Supp. 2d 17, at 37, n. 19 (S.D.N.Y. 2002)).  Assuming <u>arguendo</u> that the burden fell upon the government, the Court finds that the government met its burden.

The government asks this Court to infer that Fish had discussed the issue with Kropp and therefore knew that her false testimony was about to be exposed.  Although Kropp did not testify, other evidence presented at the hearing compels that inference.  Fish gave her false testimony in February, but she waited almost three months before making any effort to recant.  Then, just days after Kropp confessed, she contacted the government to admit that she had been untruthful.  The Court cannot attribute this timing to mere coincidence.  The only reasonable inference to be drawn from the testimony is that Fish must have spoken to Kropp sometime between April 21st (when he confessed) and April 25th (when Fish confessed).  Accordingly, the Court finds that it was already manifest to Fish that her perjury had been exposed when she came

in to recant on April 25th.  Because Fish cannot satisfy this requirement of the

recantation defense, prosecution is not barred by subsection (d) of § 1623.[7]


**B.**     **Dismissal or Suppression based upon Constitutional Violation**

          Alternatively, Fish seeks dismissal of the indictment or suppression of her

grand jury testimony on the ground that her Fifth and Sixth Amendment rights were

violated.  For the reasons that follow, the Court finds that no constitutional violation

occurred.


          1.     February 1, 2005 Grand Jury Proceeding

          The Court adopts the Magistrate Judge's conclusion that Fish's Fifth

Amendment rights were not violated at any point during the February 1, 2005 grand jury

proceeding.  Although Fish was not specifically advised of her Fifth Amendment right

against self-incrimination, she was not a "target" of the grand jury when she appeared

to testify on that date.  She was issued a grand jury subpoena because it was believed

that she had information relating to Cain's attempts to influence the grand jury

testimony of Larry Kropp.  The subpoena was not accompanied by the traditional

"target" warnings because, at that time, Fish was not a target of the grand jury's

---

          [7]  Magistrate Judge Schroeder determined that the defendant could not satisfy the
second element of the recantation defense – that the recantation occur before the proceedings
were substantially affected.  In light of this Court's determination that the defendant failed to
satisfy one of the two requirement elements of the defense, the Court declines to address
whether the second element would have been satisfied.

13

investigation, that is, she was not under investigation by the grand jury for criminal activity.

Before testifying, Fish was advised by the AUSA that her oath obligated her to testify truthfully and that any false statements made to the grand jury could subject her to a perjury prosecution. The Court finds no fault with this admonition as it was an accurate statement of the law. Although the government did not go further and advise her of her Fifth Amendment right against self-incrimination, its failure to do so provides no excuse for her false testimony and therefore no basis for suppressing that testimony or dismissing the indictment. See United States v. Mandujano, 425 U.S. 564, 576-78 (1976); United States v. Wong, 431 U.S. 174, 178-79 (1977). In Mandujano, a grand jury witness claimed that his false statements before a grand jury should have been suppressed from his perjury trial because he was never read his full Miranda rights. See Mandujano, 425 U.S. at 569. Although the Court was divided as to the exact nature of Mandujano's constitutional rights before the grand jury, the Court was unanimous that a violation of those rights--whatever their nature--would not require exclusion of his false statements at his perjury trial. See id. at 576-77, 582-84 (plurality opinion); id. at 585 (Brennan, J., concurring); id. at 609 (Stewart, J., concurring). Chief Justice Burger declared for a plurality that "[p]erjured testimony is an obvious and flagrant affront to the basic concepts of judicial proceedings." Id. at 576. As such, he observed that the Court's cases "have consistently--indeed without exception--allowed sanctions for false statements or perjury," even "where the perjurer complained that the Government exceeded its constitutional powers in making the inquiry." Id. at 577.

14

Just one year later, in United States v. Wong, 431 U.S. 174 (1977), the Court held that a target witness who was called to testify before a grand jury and who was later indicted for perjury committed before the grand jury, was not entitled to have the false testimony suppressed on ground that no effective warning of the Fifth Amendment privilege to remain silent was given.  The Court reiterated the fundamental principle that "the Fifth Amendment privilege does not condone perjury."  Id. at 178. Although defendants may find themselves in situations where they must choose between incriminating themselves with the truth or lying, perjury is simply not an option. See id. at 178-80.  "If the citizen answers the question, the answer must be truthful." Id. at 180.  See also Harris v. New York, 401 U.S. 222, 225 (1971) ("Every criminal defendant is privileged to testify in his own defense, or to refuse to do so.  But that privilege cannot be construed to include the right to commit perjury."); Bryson v. United States, 396 U.S. 64, 72 (1969) ("[I]t cannot be thought that as a general principle of our law a citizen has a privilege to answer fraudulently a question that the Government should not have asked. Our legal system provides methods for challenging the Government's right to ask questions--lying is not one of them.").

Although Fish had not been specifically warned of her right to remain silent, she had been warned that any false statement could be used against her in a subsequent perjury charge.  That warning was sufficient to advise her of the perils of providing false testimony.  Accordingly, pursuant to Mandujano and Wong, it is clear the suppression of Fish's February 1, 2005 grand jury testimony is not warranted.

2.      April 25, 2005 Meeting

In an earlier order, the Court directed the parties to brief the issue of whether Investigator Weidel and Agent Bernhard were required to advise Fish of her Miranda rights at any time during the April 25, 2005 meeting.  Upon hearing testimony regarding the events surrounding that meeting and upon review of the parties' supplemental submissions, the Court is satisfied that Miranda warnings were not required.

The Supreme Court has made clear that police officers may not interrogate a suspect who has been taken into custody without first warning the person "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." Miranda v. Arizona, 384 U.S. 436, 479 (1966); accord Dickerson v. United States, 530 U.S. 428, 443-44 (2000) (revisiting and reaffirming Miranda ).  If a suspect is not so warned, the statements elicited during the custodial interrogation must be suppressed.

It is also clear that Miranda warnings are not required unless the suspect is "in custody." Id.  "An individual is in custody when he or she has been 'deprived of his [or her] freedom of action in any significant way.'" United States v. Jacobs, 431 F.3d 99, 104 (3d Cir. 2005) (quoting Miranda, 384 U.S. at 444).  "In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is whether there [was] a formal arrest or

restraint on freedom of movement of the degree associated with a formal arrest."

Stansbury v. California, 511 U.S. 318, 322 (1994) (internal quotations omitted).

The evidence at the hearing established that Fish was not "in custody" at any time during the April 25, 2005 meeting with Weidel and Bernhard.  She contacted them voluntarily and requested an opportunity to come in.  She was free to leave the meeting at any point and her movement was not restricted in any way.  Although the agents initiated the conversation, Fish readily admitted lying to the grand jury.  There is simply no evidence of compulsion.  Accordingly, the Court finds (and Fish appears to concede) that Miranda warnings were not required at any point during that meeting.

       3.     May 3, 2005 Interview and Testimony

As noted above, Fish was served with a second grand jury subpoena on April 25, 2005, which commanded her to appear before the grand jury on May 3, 2005. When Fish appeared on May 3rd to provide her testimony, she was escorted by Weidel to an interview room adjacent to the grand jury proceedings whereupon he asked her to identify the specific portions of her February 1, 2005 testimony that were false.  Fish voluntarily identified the false statements.  AUSA Bruce then entered the room, advised Fish that she would need to repeat her confession to the grand jury and that she likely would be charged with perjury.  She was then brought into the grand jury room to give her testimony.  At no time during the pre-testimony interview was Fish given Miranda warnings.

Upon entering the grand jury room, Fish was advised by the AUSA that she was now a target of the grand jury investigation.  She was then advised (for the first

time) that she had the right to refuse to answer any question that might incriminate her and that anything she said could be used against her.  She was also reminded of her oath and her obligation to provide truthful testimony.  She was told that she could speak to an attorney but that her attorney could not be present in the grand jury room.  AUSA Bruce then indicated that after testifying, she would appear before a federal magistrate judge "for the purpose of obtaining an attorney . . . because [she] can't afford one" after which she would "proceed from there to resolve whatever legal difficulties [she had gotten] into with respect to [her false testimony]."  See Tr. of May 3, 2005 Grand Jury proceedings, at 4.  Fish responded affirmatively.  She then identified to the grand jury the specific answers from her February 1, 2005 testimony that were untruthful.

Fish argues that her constitutional rights were violated because she was never advised of her Miranda rights or the right to have counsel appointed before testifying to the grand jury.  The Court is satisfied that Miranda warnings were not required to be given during the pre-testimony interview because Fish was not "in custody."  Fish was not under arrest.  She was free to leave the interview room or to terminate the interview at any time.  She voluntarily agreed to be interviewed by AUSA Bruce and the agents.  Although she had appeared pursuant to a grand jury subpoena, that alone is insufficient to confer custody.  See, e.g., United States v. Manos, 1986 WL 13637, 86 CR 573 (N.D. Ill. Nov. 18, 1986) (holding that an interview conducted by FBI agent and AUSA prior to the defendant's grand jury appearance was not custodial despite the fact that the defendant had appeared pursuant to a subpoena); United States v. Rizzo, 487 F. Supp. 326 (W.D. Mo. 1980) (holding that the defendant was not "in custody" when he appeared pursuant to a subpoena to provide fingerprint evidence

18

and thereafter gave voluntary incriminating statements).  The grand jury subpoena merely compelled Fish to *appear* to testify before it.  It did not compel her to submit to the pre-testimony interview or to give statements at issue.  She voluntarily cooperated with the government because she wanted to correct her earlier false testimony.

Fish argues that she was misled by the AUSA who told her that he would "help her" with the perjury charge if she cooperated.  Promises of leniency go to the issue of whether the confession was voluntary or coerced.  "[A] confession is not involuntary merely because the suspect was promised leniency if he cooperated with law enforcement officials."  See United States v. Guarno, 819 F.2d 28, 31 (2d Cir. 1987); see also United States v. Pomares, 499 F.2d 1220, 1221-22 (2d Cir.), cert. denied, 419 U.S. 1032 (1974) (finding nothing improper where the defendant was told by federal agents that he faced "heavy penalties" and "that the wisest course of action would be to cooperate with the government.").  Rather, "vague promises of leniency for cooperation are just one factor to be weighed in the overall calculus and generally will not, without more, warrant a finding of coercion."  See United States v. Gaines, 295 F.3d 293, 299 (2d Cir. 2002); see also, United States v. Bye, 919 F.2d 6, 9 (2d Cir. 1990).

The Court finds that the prosecutor's vague representation to "help" Fish if she cooperated did not amount to the type of coercion that would render her confession involuntarily.  Nor did the prosecutor's statement that Fish was likely to be charged with perjury alter the non-coercive atmosphere.  Those statements were made after Fish had voluntary confessed to perjury twice – first on April 25, 2005, and second on May 3, 2005, before Bruce entered the room.  Because the prosecutor's statements were

made *after* Fish had already re-confessed it was simply impossible for his statements to

have "compelled" her self-incrimination.

Further, pursuant to United States v. Mandujano, 425 U.S. 564 (1976), the

prosecutor was not required to give full Miranda warnings before Fish's May 3rd grand

jury testimony.  In Mandujano, the prosecutor advised a target witness called to testify

before the grand jury that he was obligated to answer every question truthfully, that he

was not required to answer questions that might some how incriminate him, that he

could be charged with perjury if he testified falsely, and that he was entitled to consult

with counsel if he so desired but counsel would not be permitted in the grand jury room.

See id. at 567-68.  In this case, Fish received virtually identical warnings.  Before giving

any testimony on May 3rd, Fish was advised that she was obligated to provide truthful

testimony, that her failure to do so could subject her to a perjury prosecution, that she

could refuse to answer any question that might incriminate her, and that she had the

right to consult with an attorney but that counsel could not be present in the grand jury

room.  The Supreme Court in Mandujano declined to decide whether *any* Fifth

Amendment warnings were required when a target is called to testify before the grand

jury, and found instead that the "warnings given were more than sufficient to inform [the

witness] of his rights and his responsibilities . . . ."  Id. at 580.  As Fish was given

virtually identical warnings, those warnings were sufficient to apprise her of her right

against self-incrimination.  Fish was advised of her right to refuse to answer any

questions that might incriminate her.  That she voluntarily chose to waive her right

(perhaps in hopes of leniency) does not render her confession involuntary.  The Fifth

Amendment protects against *compelled self-incrimination*, but it does not preclude

20

voluntary self-incrimination "whether spontaneous or in response to questions put by government officials."  See United States v. Washington, 431 U.S. 181, 186-87 (1977). The Fifth Amendment "proscribes only self-incrimination obtained by a 'genuine compulsion of testimony.'"  Id. at 187.   "Absent some officially coerced self-accusation, the Fifth Amendment privilege is not violated even by the most damning admissions." Id.

To the extent that Fish argues that her Sixth Amendment right to counsel was violated, the government correctly notes that, since Fish had not yet been formally charged with a crime, her Sixth Amendment right to counsel had not attached.  See Davis v. United States, 512 U.S. 452, 456-457 (1994) ("[T]he Sixth Amendment right to counsel attaches only at the initiation of adversary criminal proceedings, and before proceedings are initiated a suspect in a criminal investigation has no constitutional right to the assistance of counsel.")(internal citations omitted); Mandujano, 425 U.S. at 581 (Because "[n]o criminal proceedings had been instituted against [the grand jury witness] the Sixth Amendment right to counsel had not come into play.").

Fish was advised by the AUSA of her right to consult with counsel at any time during the grand jury proceedings, but counsel could not be with her in the grand jury room.  This was an accurate statement of the law.  See Mandujano, 425 U.S. at 581.  Fish challenges the AUSA's failure to *explicitly* advise her of her right to have counsel appointed because he knew that she could not afford an attorney.  She also claims that he (the AUSA) misled her into believing that counsel could not be appointed until *after* she testified.  During her May 3rd grand jury testimony, AUSA Bruce noted that Fish was to appear before a federal magistrate judge following her grand jury

21

testimony "for the purpose of obtaining an attorney" because she couldn't afford one, and "to resolve whatever legal difficulties" existed by virtue of her perjury.  Fish argues that those statements, coupled with the AUSA's failure to explicitly advise her of her right to have counsel appointed, created the erroneous impression that she was not entitled to have counsel appointed *before* testifying.  Fish points out that this omission was further compounded by the fact that the subpoena issued to her on April 25th lacked the required "target" warnings in violation of § 9-11.151 of the U.S. Attorney's Manual.

While the Court finds the seemingly misleading import of the AUSA's comments to Fish to be disconcerting, the Court does not believe that his failure to affirmatively inform Fish that counsel could be appointed before she testified rose to the level of a constitutional violation.  Notably, the prosecutor in <u>Mandujano</u> was also advised by the grand jury witness that he could not afford counsel, to which the prosecutor responded:

> Well, if you would like to have a lawyer, he cannot be inside this room.  He can only be outside.  You would be free to consult with him if you so chose. Now, if during the course of this investigation, the questions that we ask you, if you feel like you would like to have a lawyer outside to talk to, let me know.

<u>Mandujano</u>, 425 U.S. at 567-68.  The advice given to Fish on this issue is as follows:

> [Y]ou have the right to be represented here today by an attorney.  Your attorney can't be here in the room with you, he must remain outside in the hallway.  On the other hand, you do have the right to excuse yourself on a reasonable basis to confer with your attorney before answering my question or any question a juror might want to put to you.

22

See Tr. of May 3, 2005 Grand Jury proceedings, at 3.  In both cases (this case and

Mandujano) the AUSA, having been advised of the witness's inability to afford counsel,

failed to explicitly advise the witness that counsel could be appointed.  Yet the Supreme

Court found the warnings in Mandujano adequate to advise the defendant of his Fifth

Amendment rights.  The only difference between Mandujano and this case is that in

Mandujano, it was ambiguous as to whether counsel could be appointed, whereas here,

the AUSA's comments arguably inferred to Fish that she would have to wait until after

testifying before counsel could be appointed.  However, since Fish never sought to

clarify this issue, the Court does not believe these comments alone provide a basis for

suppressing her testimony.  The Fifth Amendment right to counsel is predicated upon

the right against *compelled* self-incrimination.  It cannot be said that the AUSA's

comments *compelled* Fish's confession in any way where she had already made the

*same confession*, voluntarily, on two earlier occasions.  Absent compelled self-

incrimination, there was no Fifth Amendment violation.


C.      **Supervisory Authority to Suppress Testimony**

        Nor is suppression warranted pursuant to this Court's supervisory authority.

Magistrate Judge Schroeder recommended that Fish's May 3rd grand jury testimony be

suppressed to "prevent the government from profiting from its refusal to afford the

defendant an opportunity to obtain assigned counsel before she incriminated herself . .

. ."  See Report and Recommendation, at 29.  The Magistrate Judge took "judicial

notice of the practice of the United States Attorney's Office in this district . . . of advising

grand jury targets of the opportunity to apply for assigned counsel" and found that the practice had been intentionally disregarded in this case because the prosecutor desired to "get a confession" from Fish.  Id. at 28-29.

This Court shares Magistrate Judge Schroeder's disappointment with the procedures employed in this case and notes that at least two Department of Justice ("DOJ") directives were disregarded by the prosecutor.[8]  Nevertheless, the Court finds that "a violation by the government of its internal operating procedures, on its own, does not create a basis for suppressing . . . grand jury testimony."  See United States v. Myers, 123 F.3d 350, 355-56 (6th Cir. 1997).  In Myers, as in this case, the defendant moved to suppress his self-incriminating grand jury testimony on the ground that he was never advised "that if he could not afford a lawyer, one would be provided for him" or that he was the target of the grand jury's investigation.  Id. at 353.  However, like Fish, defendant Myers was advised that he had the right to refuse to answer any question that might incriminate him and that he had the right to consult with an attorney.  The Sixth Circuit found that the warnings given had adequately apprised Myers of his Fifth Amendment rights, and that the government's failure to comply with DOJ directives did not provide a basis for suppressing that testimony.  In so holding, the Sixth Circuit recognized that in United States v. Jacobs, 547 F.2d 772 (2d Cir.1976) -- a case relied

_____

[8]  In addition to failing include the advice of rights notice along with Fish's grand jury subpoena, see § 9-11.151 of the U.S. Attorney's Manual, the U.S. Attorney's manual also states that "[n]ormally, no perjury prosecution should be undertaken after a solicited recantation, even if the defendants was technically ineligible [for the recantation defense] under § 1623(d)."  See U.S. Attorney's Manual, Title 9, § 1751.  This directive, which AUSA Bruce dismissed as merely a "practice tip," appears to apply to the facts of this case.  It not clear to whether this directive was even considered before initiating charges against Fish, and if so, why it was not followed.

24

upon by Magistrate Judge Schroeder -- the Second Circuit exercised its supervisory authority to suppress grand jury testimony that was obtained by a target witness who, contrary to DOJ policy, was not given the 'advice of rights' form.  However, the Sixth Circuit also warned that, since <u>Jacobs</u>, "the Supreme Court has severely curtailed the ability of federal courts to fashion remedies based upon their supervisory powers." <u>Myers</u>, 123 F.3d at 356 (citing <u>United States v. Williams</u>,  504 U.S. 36 (1992)).  The court also pointed to First and Seventh Circuit cases decided after <u>Jacobs</u> that rejected attempts to suppress grand jury testimony based upon the government's failure to comply with DOJ manual provisions.  <u>Id.</u> at 357 (citing <u>United States v. Pacheco-Ortiz</u>, 889 F.2d 301 (1st Cir. 1989) and <u>United States v. Gillespie</u>, 974 F.2d 796 (7th Cir. 1992)).

In light of this authority and the Supreme Court's admonition that "any power federal courts may have to fashion . . . rules of grand jury procedure is a very limited one . . .", <u>see</u> <u>Williams</u>, 504 U.S. at 50, the Court finds that the defendant's motion to suppress her May 3rd grand jury testimony and her pre-testimony interview statements should be denied.  The AUSA's failure to comply with DOJ directives provides no basis for suppressing testimony where no constitutional violation occurred.[9]

---

[9] Nothing herein is intended to express approval of the government's failure to follow DOJ procedures.  This Court agrees with the Sixth Circuit's admonition that "[t]he government should apply all its rules in a consistent manner with respect to targets appearing before the grand jury."  <u>Myers</u>, 123 F.3d at 358.  Doing so not only ensures that all defendants will stand as equals under the law, but also that courts will not be burdened needlessly with having to address a host of constitutional questions that could easily have been avoided had proper procedures been followed.

## <u>CONCLUSION</u>

For the reasons stated, the Court hereby denies Fish's motion to dismiss the indictment and to suppress evidence in its entirety, and adopts Magistrate Judge Schroeder's report and recommendation except to the extent set forth herein.  Fish's remaining arguments are denied for the reasons stated by Magistrate Judge Schroeder.

IT IS SO ORDERED.

_/s/ Richard J. Arcara_
HONORABLE RICHARD J. ARCARA
CHIEF JUDGE
UNITED STATES DISTRICT COURT

DATED: December 18, 2006